**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Jill Williams, et al.** | * | |
| | * | |
| Plaintiffs | * | |
| | * | Case No. 07-3459-PWG |
| **v.** | * | |
| | * | |
| **Sandra Long** | * | |
| | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>MEMORANDUM</u>

**I. Background Facts**

On December 27, 2007, Plaintiffs Jill Williams and Erin Dechowitz ("Plaintiffs"), on behalf of themselves and others similarly situated, filed a collective action against Defendant Sandra Long ("Defendant"), owner of Charm City Cupcakes, under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq*. The Plaintiffs alleged the Defendant had violated §§ 206(a)(1) and 207(a)(1) of the FLSA by failing to compensate the Plaintiffs at the minimum wage and provide overtime pay. Pls.' Compl. ¶¶ 18-19, Paper No. 1. Additionally, the Plaintiffs contended the Defendant had violated Baltimore City's Wage and Hour Law, Balt., Md., Lab. & Empl. Code art. 11, §§ 3-1, 3-3 (2008), and Maryland's Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq*. *Id*. ¶¶ 20-22.

As alleged in the Plaintiffs' Complaint, from October 2007 to November 2007, the Plaintiffs were employed by the Defendant at various times to prepare, bake, or even serve cupcakes at the Defendant's business establishment or various sites. *Id.* ¶ 11. The Defendant allegedly promised Plaintiff Williams that she would receive an hourly wage of $15.00 an hour, and that Plaintiff Dechowitz would receive $6.25 an hour. *Id.* Supposedly, despite working a "couple hundred hours between them," the only wage either Plaintiff received was a $20.00 cash advance given to Plaintiff Dechowitz from the Defendant. *Id.*

On March 10, 2008, the Defendant filed an Answer, Paper No. 7, and brought counterclaims alleging breach of contract, breach of fiduciary duty, and invasion of privacy. Def.'s Countercl. ¶¶ 20-40, Paper No. 8. In response, the Plaintiffs moved to dismiss the Defendant's counterclaims pursuant to Fed. R. Civ. P. 12(b)(1) on the basis that the United States District Court of Maryland did not have supplemental jurisdiction over the counterclaims under 28 U.S.C. § 1367 (2008). Pls.' Mot. Dismiss 1, Paper No. 9. Subsequently, the Court ruled that the Defendant's counterclaims were merely permissive and lacked their own independent jurisdictional basis, thereby effectively granting the Plaintiffs' Motion to Dismiss. *Williams v. Long*, 558 F. Supp. 2d 601, 603-06 (D. Md. 2008).

2

Previously, on May 9, 2008, the Plaintiffs moved to conditionally certify a collective action pursuant to § 216(b) of the FLSA, and sought approval and facilitation of a notice to potential class members. Pls.' Mot. 1, Paper No. 15. This section provides:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

§ 216(b). In order to demonstrate other employees were "similarly situated," the Plaintiffs relied on *Bell v. Mynt Entm't, LLC*, 223 F.R.D. 680 (S.D. Fla. 2004), stating that "'the class certification determination is made using a fairly lenient standard, based primarily on the pleadings and any affidavits which have been submitted.'" Pls.' Mot. 3 (quoting *Bell*, 223 F.R.D. at 681). Accordingly, Plaintiffs' counsel attached to the Motion five exhibits as evidence of the Defendant's alleged actions towards others similarly situated to the existing Plaintiffs. Pls.' Exhs. ## 1-5, Paper No. 15, ## 2-6.

Exhibit # 1 was a copy of printed search results from the Maryland Judiciary Case Search website, which was not authenticated by affidavit or other extrinsic evidence. The

printed webpages contained information pertaining to three independent lawsuits pending against "Charm City Cupcakes" in the "Baltimore City District Court"; however, the printed webpages merely stated that the suits were "Contract" claims and did not divulge the specific allegations of each particular suit. Pls.' Exh. # 1.

Exhibit # 2 was a copy of a civil complaint filed on behalf of Amanda Achey, another employee of the Defendant who reportedly failed to receive adequate compensation for work done from August 14, 2007, to September 3, 2008. Pls.' Exh. # 2. At the top of Ms. Achey's complaint was a fax number, suggesting Ms. Achey's attorneys had faxed a copy of the complaint to Plaintiffs' counsel. *Id.* This exhibit was also not authenticated by any extrinsic evidence.

Exhibit # 3 was similar to Exhibit # 1, and displayed printed case search results from the website of the Employment Standards Service of the Division of Labor and Industry, in the Maryland Department of Labor, Licensing and Regulation ("MDLLR"). The search results clearly showed there were four closed claims against "Charm City Cupcakes," yet, once again, the search results did not state the nature of the claims and were not authenticated by extrinsic evidence. Pls.' Exh. # 3.

Exhibit # 4 was an affidavit from Hope Sachs, Assistant Attorney General to the MDLLR, who is responsible for

representing the Commissioner of Labor and Industry to the use and benefit of individuals who have filed claims for unpaid wages with the Employment Standards Service.  Pls.' Exh. # 4. In her affidavit, Ms. Sachs stated that on September 7, 2007, she received two claims for unpaid wages against "Sandra Long d/b/a Charm City Cupcakes" in the amounts of $487.07 and $517.74, and noted the claims were appropriate for litigation. *Id.*  Ms. Sachs also stated she received two additional claims on April 18, 2008, in the amounts of $495.38 and $1,079.36, and also believed these claims would be appropriate for litigation. *Id.*  Finally, Ms. Sachs noted she received a claim on November 15, 2006, in the amount of $558.00, but that the Defendant paid the claimant the full disputed amount on March 29, 2007.  *Id.* Of the five total claims described by Ms. Sachs, only the November 15th claim appeared to be present on the printed webpage from the website of the Employment Standards Service.[1]

Exhibit # 5 was an affidavit from Samantha Stuck, a former employee of the Defendant who also claimed that she was a victim of FLSA violations by the Defendant, and indicated her

---

[1] On Exhibit # 3, "Claim No. 0611113" began on "2006.11.15," and was determined to be closed on "2007.03.29."  Pls.' Exh. # 3.  In the table marked "Disposition," there is a number "4," and a handwritten message stating, "Paid Wages, Employer Paid Wages."  *Id.*  For the other three claims on the printed webpage, there is a number "16," and a message noting, "Refer to AG's."  *Id.*

willingness to opt-in as a plaintiff if the case was to be certified as a collective action.  Pls.' Exh. # 5.

In addition to the attached materials, the Plaintiffs also submitted a proposed notice of a collective action, Pls.' Notice, Paper No. 15, # 7, a consent form to be a class member in a suit against "Sandra Long d/b/a Charm City Cupcakes," Pls.' Consent Form, Paper No. 15, # 8, and a proposed order granting the Plaintiffs' Motion, Pls.' Proposed Order, Paper No. 15, # 9.

The Defendant filed a Memorandum in Opposition, contending the discovery process should be permitted to proceed before any certification was made.  Def.'s Mem. Opp'n ¶ 8, Paper No. 16. Specifically, the Defendant urged the Court to deny the Plaintiffs' Motion without prejudice and permit the Plaintiffs to renew the Motion after a period of discovery had been completed.  *Id.*

Before the August 20, 2008 hearing on Plaintiffs' Motion, the Court sought to determine the accessibility of the printed, online information marked as Exhibits # 1 and # 3.  In regards to Exhibit # 1, the Maryland Judiciary Case Search website was accessed, and using the case search function on the website, "Charm City Cupcakes" was entered under "Company Name."  The results obtained were virtually identical to those submitted by

the Plaintiffs in support of their Motion.[2]   In regards to Exhibit # 3, the uniform resource locator ("URL") printed at the top of the webpage was used to access the website; however, further access to the contents of the website was not possible without an Employment Standards Service email address and employee password.

At the hearing on the Plaintiffs' Motion, I asked Plaintiffs' counsel to proffer how he was able to access the information contained in Exhibit # 3 from the Employment Standards Service website.   In response, counsel advised that he obtained a printout of the search results pursuant to a request for records under Maryland's Public Information Act ("MPIA"), Md. Code Ann., St. Gov't §§ 10-611 *et seq.   See* Pls.' Mot. 5 n.2.   At the conclusion of the hearing, I rendered an oral opinion granting the Plaintiffs' Motion, but reserved the right to file a more comprehensive opinion explaining certain aspects of my ruling, which is found herein.

---

[2]The time stamp on each printed webpage noted that the online information was printed on "4/21/2008 6:33 PM."   Pls.' Exh. # 1.   The results showed Janae Aiken, Amanda Achey, and Aundrea Newman filed claims against the Defendant on "2/12/08," "2/20/08," and "8/28/07," respectively.   *Id.*   Although the first printed webpage noted all three cases were "Active," further details relating to Ms. Newman's suit listed the claim as having a "Judgment Entered in Favor of the Plaintiff" on "3/26/08."   *Id.*   As noted by Plaintiffs' counsel, the printed webpage stated that the Defendant had not yet satisfied the judgment. Pls.' Mot. 4-5 & n.1; Pls.' Exh. # 1.   On August 22, 2008, the Court performed another search on the Maryland Judiciary Case Search website, and this search disclosed that Ms. Newman's claim had been switched from "Active" to "Closed."   Also, Ms. Newman's claim status had been changed to "Satisfied."

## II. Certification of a Class Action

Under the FLSA, § 216(b) "establishes an 'opt-in' scheme whereby potential plaintiffs must affirmatively notify the court of their intention to become a party to the collective action." *Montoya v. S.C.C.P. Painting Contractors, Inc.*, No. CCB-07-455, 2008 WL 554114, at *1 (D. Md. Feb. 26, 2008) (quoting *Marroquin v. Canales*, 236 F.R.D. 257, 259 (D. Md. 2006)) (internal quotation marks omitted).

Most recently, the *Montoya* court provided an extensive overview of the law detailing a court's conditional certification of a class action. As stated in the case, district courts "'have discretion, in appropriate cases, to . . . facilitat[e] notice to potential plaintiffs.'" *Id.* (alteration in original) (quoting *Camper v. Home Quality Mgt.*, 200 F.R.D. 516, 519 (D. Md. 2000)). For example, the plaintiffs in *Montoya* sought the court's approval for a submitted draft of a notice to other as yet unidentified migrant workers, informing them of their right to opt-in to a suit for violations of the FLSA. *Id.* This notification is necessary to ensure unknown employees obtain "'accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.'" *Id.* at *2 (quoting *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 486, 107 L. Ed. 2d 480 (1989)). "'The relevant

inquiry then is not whether the court has discretion to facilitate notice, but whether this is an appropriate case in which to exercise that discretion.'"  *Id.* (quoting *Camper*, 200 F.R.D. at 519).

The paramount issue in determining the appropriateness of a conditional class certification is whether plaintiffs have demonstrated that potential class members are "similarly situated."  § 216(b), *cited in Montoya*, 2008 WL 554114, at *1; *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 770 (D. Md. 2008); *Marroquin*, 236 F.R.D. at 259; *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 893 (D. Md. 1995).  Accordingly, plaintiffs must make a preliminary factual showing indicating a similarly situated group of potential plaintiffs exists. *Montoya*, 2008 WL 554114, at *2; *Camper*, 200 F.R.D. at 519. "'This would include factual evidence by affidavits or *other means*, but mere allegations in the complaint would not suffice.'"  *Montoya*, 2008 WL 554114, at *2 (emphasis added) (quoting *Quinteros*, 532 F. Supp. 2d at 772).

In *Marroquin*, thirty-seven day laborers filed suit after allegedly failing to receive sufficient compensation under the FLSA for debris removal work following Hurricane Katrina, and, in the court's view, the submission of affidavits was pivotal in demonstrating a factual basis to support certification. *See* 236 F.R.D. at 260.  To demonstrate there were approximately 113

unidentified potential claimants, the plaintiffs submitted
affidavits describing tales of "underpayment, unpaid overtime,
and bounced paychecks." *Id.* Moreover, nearly every affiant
reported that the defendants never sought to have workers fill
out any applications or paperwork, resulting in an "environment
where the alleged abuses [were] more possible." *Id.* at 261
n.15. Whereas the presence of a company-wide policy can often
be key to the approval of a court facilitated notice, *compare
D'Anna*, 903 F. Supp. at 894 (finding plaintiffs' lack of
evidence of company policy to be insufficient), *with Montoya*,
2008 WL 554114, at *3 (noting "plaintiffs' sworn declarations"
contained accusations of defendant supervisors enforcing a
policy not to pay overtime wages, thereby resulting in class
certification), the *Marroquin* court could not envision how the
plaintiffs would be able to possess evidence of an explicit
policy of issuing bad checks or refusing to pay wages. 236
F.R.D. at 260. Thus, plaintiffs would only need to show
potential claimants had been victimized by a "common policy or
scheme or plan that violated the law." *Id.*

Contrary to the suggestions made by Plaintffs' counsel,
Exhibits # 4 and # 5 are undoubtedly *not* affidavits; the
statements were not made under oath and sworn before a person
with authority under the law to administer oaths. 2A C.J.S.
*Affidavits* § 1, at 214 (2003). Rather, the written submissions

from Ms. Sachs and Ms. Stuck are unsworn statements declared to be true under penalty of perjury; therefore, these statements are mere declarations. *Id.* at 215. Notwithstanding this distinction, I see no reason as to why this Court should not consider them in determining whether to conditionally certify the class in this case. First, courts are permitted to use "other means" besides the submission of affidavits in reviewing a motion for certification. *Montoya*, 2008 WL 554114, at *2 (citation omitted). Second, in *Montoya*, declarations made under penalty of perjury were supplied by the plaintiffs, and the court relied on them in granting the plaintiffs' motion. *Id.* (citing Mot. Certify Class Exh. E, Aplicano Decl. ¶ 8; Mot. Certify Class Exh. D, Carrera Decl. ¶ 10; Mot. Certify Class Exh. G, Montoya Decl. ¶ 8). As a result, this Court will adhere to the practice set forth in *Montoya* and accept the declarations of Ms. Sachs and Ms. Stuck as evidence supporting the Plaintiffs' Motion.

Even without any additional evidence, Exhibits # 4 and # 5 would be sufficient to meet the initial threshold for conditional certification of a collective action.[3]   Ms. Stuck

---

[3]Exhibit # 2, the copy of the complaint filed on behalf of Ms. Achey, also indicates there are other individuals who reportedly have failed to receive earned wages from the Defendant.  Although Exhibit # 2 was not authenticated by extrinsic evidence, Fed. R. Evid. 901(b)(4) permits authentication based solely on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *See Link v. Mercedes-Benz of North Am., Inc.*, 788 F.2d 918, 928 & n.9 (3d Cir.

alleges that she worked for the Defendant in the fall of 2007, and that she too was deprived of wages.  Ms. Stuck also alleges she is "aware of at least one other person who might be interested in joining the case . . . who was not paid any wages, let alone the minimum wage."  Pls.' Exh. # 5.  Also, the declaration from Ms. Sachs notes there have been other claimants seeking compensation from the Defendant for performed work, and this suggests there could be remaining claimants who would willingly join the instant action.  Pls.' Exh. # 4.  However, as next will be explained, Plaintiffs' other exhibits also merit consideration as evidence supporting their Motion.

## III. Self-Authentication of Official Publications under Fed. R. Evid. 902(5)

The Plaintiffs have submitted printed webpages from websites which, if authentic and considered for their substantive truth, suggest there are other claimants who might desire to join the Plaintiffs' suit.  Pls.' Exhs. ## 1 & 3. Defense counsel did not object to the exhibits, but, during the

---

1986) (authentication of documents based on "company logos and other trademarks"); *Air Land Forwarders, Inc. v. United States*, 38 Fed. Cl. 547, 554 (1997) (authentication of document based on letterhead and accompanying signature).  Exhibit # 2 was signed by the two attorneys representing Ms. Achey, and the fax number for Ms. Achey's attorneys is printed at the top of the complaint.  Pls.' Exh. # 2.  There also is a time stamp on the complaint, which notes the date the complaint was filed in the District Court of Maryland for Baltimore City.  This means that Exhibit # 2, as a copy of a court document, would also be authenticated under Fed. R. Evid. 901(b)(7) (permitting authentication of public records or reports).  Consequently, Exhibit # 2 is sufficiently authenticated.  Thus, the court cites Exhibit # 2, and the information contained therein, as additional justification for granting the conditional certification.

hearing, I observed that these exhibits were authenticated, despite the absence of extrinsic evidence to demonstrate that they were what they purported to be.

In *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 537 (D. Md. 2007), this Court noted that accepting electronically stored information ("ESI") as evidence, whether at trial or in summary judgment, implicates a series of potential evidentiary hurdles. In order to successfully clear the first two hurdles, a proponent of ESI must show that it is relevant under Fed. R. Evid. 401, and afterwards, authentic under Fed. R. Evid. 901(a). Exhibits # 1 and # 3, both of which purport to be printed webpages, easily meet the relevancy requirement. The next issue is whether they have been shown to be authentic.

When analyzing the authenticity of evidence, including ESI, Rule 901(a) notes that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Extrinsic evidence, however, is not always necessary. "Case law and statutes have, over the years, developed a substantial body of instances in which authenticity is taken as sufficiently established for purposes of admissibility without extrinsic evidence . . . because practical considerations reduce the

possibility of unauthenticity to a very small dimension." Fed. R. Evid. 902 advisory committee's note to the 1972 proposed rules.  Under Fed. R. Evid. 902(5), extrinsic evidence of authenticity as a condition precedent to the admissibility of evidence is not required if the evidence is a book, pamphlet, or other publication purporting to be issued by a public authority. This "common-sense provision" is based upon the following notions:

> One is that official publications seldom contain serious mistakes in the reproduction of official pronouncements or other matters of sufficient interest to warrant official publication.  Another is that official publications are likely to be readily identifiable by simple inspection, and that forgery or misrepresentation of such material is unlikely.  There are a number of statutes and a provision in the Federal Rules of Civil Procedure which make particular kinds of official publications self-authenticating.

5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 9:34, at 588 & n.2 (3d ed. 2007) (citing Fed. R. Civ. P. 44(a)(1)-(2) (noting the admissibility of official publications of domestic and foreign records)).

Before addressing the applicability of Rule 902(5) to the website postings offered as Exhibits # 1 and # 3, we must first address two issues.  First, how is "public authority" defined under the rule?  Second, what exactly is an "other publication" as used in the rule?

"Rule 902(5) is silent on what level of government must authorize the publication."  5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 902.07[1], at 902-29 (2d ed. Supp. 2008).  Even though the rule may be unclear, Rule 902(5) is most often construed to cover the governmental bodies listed in Fed. R. Evid. 902(1), which provides for self-authentication of domestic publication documents under seal.  As such, these entities would be regarded as public authorities: "(1) the United States, (2) any State, (3) any district, commonwealth, territory, or insular possession of the United States, (4) the Panama Canal Zone, (5) the Trust Territory of the Pacific Islands, or (6) a political subdivision, department, officer, or agency of any of the preceding bodies."  5 Weinstein & Berger, *supra*, § 902.07[2], at 902-30 & n.4 (citing Fed. R. Evid. 902(1)).  As for the second inquiry, it would not be novel to interpret Rule 902(5) to include the self-authentication of "statute books and case reports," as well as "legislative reports, published transcripts of hearings, maps and surveys, collected statistics, commissioned studies, manuals," and other data compilation publications from public authorities.  5 Mueller & Kirkpatrick, *supra*, § 9:34, at 589 & n.4 (citing *Gregg v. Forsyth*, 65 U.S. 179, 16 L. Ed. 731 (1860); *Watkins v. Holman's Lessee*, 41 U.S. 25, 10 L. Ed. 873 (1842); *United States v. Aluminum Co. of America*, 1 F.R.D. 71 (S.D.N.Y. 1939); *United*

*States v. Shafer*, 132 F. Supp. 659, 665 (D. Md. 1955), *aff'd*, 229 F.2d 124 (4th Cir. 1956); *Stewart v. United States*, 211 F. 41, 45 (9th Cir. 1914)); *accord Conjour v. Whitehall Twp.*, 850 F. Supp. 309, 312 n.1 (E.D. Pa. 1994) (self-authentication of local ordinances and regulations); *Biggers ex rel. Key v. S. Ry. Co.*, 820 F. Supp. 1409, 1415 (N.D. Ga. 1993) (self-authentication of certified copy of state map from Georgia Department of Transportation). To prove the book, statute, report, or other written material was truly published by a public authority, a proponent may identify any kind of marking or appropriate legend signifying the publication as originating from a qualifying Government Printing Office or by any state government, or a lower agency or department. 5 Mueller & Kirkpatrick, *supra*, § 9:34, at 590.

The next issue is whether, for purposes of Rule 902(5), the posting of information on a website sponsored by a public authority is the functional equivalent of publication. This evidentiary issue was first analyzed by the United States District Court of Ohio, Western Division, in *Sannes v. Jeff Wyler Chevrolet, Inc.*, No. C-1-97-930, 1999 WL 33313134 (S.D. Ohio Mar. 31, 1999). In *Sannes*, the court sought to determine whether a defendant automobile dealership qualified as a "credit repair organization" for purposes of a suit filed under the Credit Repair Organization Act ("CROA"), 15 U.S.C. §§ 1679 *et*

*seq.* 1999 WL 33313134, at *1. Claims under CROA, a consumer protection statute engineered to prevent fraud and abuses caused by credit repair organizations, typically involved a business, "'through advertisements and oral representations,'" leading consumers to believe that "'adverse information in their consumer reports [could] be deleted or modified regardless of its accuracy.'" *Id.* at *2 (quoting Consumer Reporting Reform Act of 1994, H.R. Rep. No. 103-486, at 57 (1994)). If the defendant was found to be such an entity, then summary judgment would automatically be granted in favor of the plaintiff. *Id.* at *1.

To prove that auto dealerships were not the "primary target" of Congress when it fashioned CROA, the defendant sought to introduce printed press releases from the Federal Trade Commission's ("FTC") website mentioning the FTC's concerns about "'bogus credit repair organizations'" and "'credit repair cons.'" *Id.* at *3 (citation omitted). Even though the press releases were not attached to any authenticating affidavit, the court recognized they had been printed from a "government [worldwide webpage]," and were therefore self-authenticating under Rule 902(5). *Id.* at *3 n.3. Thus, for purposes of self-authentication under Rule 902(5), the *Sannes* court implicitly recognized the FTC, an agency of a governmental body, as a

public authority.  As a result, information published by the FTC on its website was deemed to be self-authenticating.

Cases following *Sannes* showed approval of the decision, and a willingness to accept postings on "government websites" as inherently authentic.  For example, in *Hispanic Broad. Corp. v. Educ. Media Found.*, No. CV027134CAS (AJWX), 2003 WL 22867633 (C.D. Cal. Oct. 30, 2003), the court noted how "exhibits which consist of *records* from *government websites*, such as the FCC website, are self-authenticating."  *Id.* at *5 n.5 (emphasis added).  Subsequently, in *Shell Oil Co. v. Franco*, No. CV 03-8846 NM (PJWx), 2004 WL 5615656 (C.D. Cal. May 18, 2004), the court remarked that "records from government websites are self-authenticating," and permitted the plaintiff to introduce internet reports from the U.S. State Department website.[4]  *Id.* at *5 n.7 (citing *Hispanic Broad. Corp.*, 2003 WL 22867633, at *5).

---

[4]*See also Estate of Gonzales v. Hickman*, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *2 n.3 (C.D. Cal. May 30, 2007) (holding Office of the Inspector General's report to be self-authenticating due to availability on the Internet); *but see In re Poirier*, 346 B.R. 585, 588-89 (Bkrtcy. D. Mass. 2006).  In the latter case, the United States Bankruptcy Court, District of Massachusetts, was asked to take judicial notice of information posted on the Department of Education's ("DOE") website.  The court declined this request, noting it would result in a "relaxation of Fed. R. Evid. 902."  *In re Poirier*, 346 B.R. at 589.  The court remarked that the DOE website had too many links to various "documents," which although part of the website, could not reasonably be identified as "official records," "reports," or a "publication issued by a public authority."  *Id.* (internal quotation marks omitted).  These "documents" included: "[E]mergency planning for a pandemic flu, teaching aids, surveys to rate user satisfaction with the DOE website, advice about career colleges and technical schools in addition to information about educational loans."  *Id.*  The correctness of the conclusion reached by the *In re Poirier* court is questionable.  Rule 902(5) provides for self-authentication of "other publications," and it is the act of posting information on the Internet by a qualifying public authority that *is* the act

The case of *U.S. EEOC v. E.I. DuPont de Nemours & Co.*, No. Civ.A. 03-1605, 2004 WL 2347559 (E.D. La. Oct. 18, 2004), may prove to be the most helpful case in determining what is self-authenticating ESI under Rule 902(5).    In that case, the defendant sought to exclude the plaintiff's proposed exhibit—a printout of a table from the website of the U.S. Census Bureau. *Id.* at *1.   The court denied the defendant's motion, holding that data posted on a government website would be self-authenticating under the rule.   *Id.* at *2.

The *E.I. DuPont* court provided an explanation as to how a court might identify what types of data located on a government website could be accepted as authentic under Rule 902(5):

> Exhibit 552 is a table of information compiled by the United States Census Bureau based on data gathered in 1997 regarding employment of persons with disabilities. According to the EEOC, it shows that some 733,000 persons who required an assistive device or wheelchair to ambulate were employed in 1997 in the United States. *The exhibit has been printed from the internet website of the U.S. Census Bureau, and contains the internet domain address from which the image was printed and the date on which it was printed. The exhibit also clearly indicates that the source of the information is August-November 1997 data from the Survey of Income and Program Participation.*

---

of publication.  Because the DOE is a department of one of the governmental bodies listed in Rule 902(1), then the DOE would also be considered a public authority.  Thus, when the DOE *posted* information on its site, it vouched for its authenticity, thereby making it self-authenticating under Rule 902(5). There is nothing in the rule that states the public authority publishing the information (whether in print form, or online) must originate the information posted.   Rather, the publication must have actually been approved by the public authority, or, as some would say, "made official."   Thus, the information's adoption by reference by the public authority seems sufficient to meet the requirements of Rule 902(5).

. . . .

. . . [T]he Court finds that the EEOC has submitted evidence sufficient to authenticate the exhibit. Rule 901(a) states that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *The exhibit contains the internet domain address from which the table was printed, and the date on which it was printed. The Court has accessed the website using the domain address and has verified that the webpage printed exists at that location. The Court also notes that the webpage is maintained on a government website, and, according to Rule 902(5), "publications purporting to be issued by public authority" are self authenticating*. The Court thus finds that the EEOC has provided evidence sufficient to authenticate the exhibit.

*Id.* at *1-2 (emphasis added) (citations omitted). Clearly, the court accepted the printout containing the "internet domain address" and the "date on which it was printed" as sufficient for *authentication* under Rule 901(a), and because the webpage was available on a government website, concluded that this would also permit *self-authentication* under Rule 902(5).

These two points are not mutually exclusive, however. A proponent of ESI could use the URL, date, and/or official title on a printed webpage to show that the information was from a public authority's website, and therefore, self-authenticating. Similarly, the public authority's selection of the posted information for publication on its website will act as the necessary "seal of approval" needed to establish that the

information came from a public authority for purposes of Rule 902(5).  *Cf. Schaghticoke Tribal Nation v. Kempthorne*, No. 3:06-cv-00081 (PCD), 2008 WL 4000179, at *3 (D. Conn. Aug. 26, 2008) (noting government press release was self-authenticating because petitioner included the web address for press releases in its Local Rule 56(a)(1) statement, thereby allowing the court to verify that the press release in the record was a copy of an official document issued by a public authority).

**IV. Plaintffs' Exhibits # 1 and # 3 are Self-Authenticating**

*A. The Maryland Judiciary Case Search Results – Exhibit # 1*

The printed webpage from the Maryland Judiciary Case Search website is self-authenticating under Rule 902(5) for the reasons discussed above.  First and foremost, the Maryland Judiciary is a branch of the Maryland State Government; therefore, any online "official publication" issued by the Maryland Judiciary would be self-authenticating.  *See* Fed. R. Evid. 902(1), (5).  Second, the URL on the top of the printed webpage identifies that the results are in fact from the website.  Third, the first page features a caption, stating, "Maryland Judiciary Case Search Results," and the next page states, "District Court of Maryland."  Accordingly, there is no doubt that these results were published on the website of a public authority.  Thus, they are self-authenticating.

B. *MDLLR - Employment Standards Service Results – Exhibit # 3*

The printed webpage from the Employment Standards Service website could also be considered a self-authenticating "official publication."  The website is hosted by a subdivision of a state agency, and the information contained in the printed webpage is comparable to the printed data found to be self-authenticating, and admissible, in *E.I. DuPont.*  In particular, the URL on the webpage identifies the correct website, and the agency's name is printed preceding the search results.

As noted at the hearing, Plaintiffs' counsel was required to make a demand under the MPIA to obtain a copy of Exhibit # 3, as it is from a restricted portion of the website that is not available to the public.  With this point in mind, it is important not to confuse "publication," as used by Rule 902(5), with "unrestricted publication to the general public."  In *Wolf Lake Terminals, Inc. v. Mutual Marine Ins. Co.*, 433 F. Supp. 2d 933, 944 (N.D. Ind. 2005), the court found two U.S. Government documents, both obtained through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2008), to be self-authenticating.  *See also Schmutte v. Resort Condominiums Int'l, LLC*, No. 1:05-cv-0311-LJM-WTL, 2006 WL 3462656, at *14 (S.D. Ind. Nov. 29, 2006) (Department of Labor file, produced pursuant to the FOIA, found to be self-authenticating under Rule 902(5)).  Rule 902(5) imposes no requirement that an official publication be available

without restriction to the general public, and simply because additional measures, such as an FOIA request or subpoena under Fed. R. Civ. P. 45, must be employed to gain access to the publication does not mean the document is not self-authenticating.  It would serve no legitimate purpose to require a proponent of an exhibit that facially meets the requirements of Rule 902(5) to go to the added trouble and expense of calling a witness or producing an affidavit to prove how the proponent obtained a copy of the document.  Thus, if information is published on a website by a public authority and that information is obtained through the FOIA (or, as in this case, an equivalent state act), then that printed information would be self-authenticating under Rule 902(5).

**V. Exhibits # 1 and # 3 Meet the Requirements of the Fed. R. Evid. 803(8) Hearsay Exception**

In addition to showing relevancy and authenticity, it is also necessary to consider whether Exhibits # 1 and # 3 are hearsay, *see* Fed. R. Evid. 801-02; *Lorraine*, 241 F.R.D. at 537, and if so, whether the exhibits would fall under a recognized exception to the rule.  *See* Fed. R. Evid. 803.

Clearly the exhibits are hearsay, for they are proffered for the truth of their substantive content.  *See* Fed. R. Evid. 801(c).  However, they are admissible as public records under

Fed R. Evid. 803(8).  *Lorraine*, 241 F.R.D. at 574-75.  Under this section, the following are exempt from the hearsay rule:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).  Justification for this exception derives from the trustworthiness of the documents themselves, having been made by a public office or agency, as well as the inherent necessity to avoid requiring public officials to needlessly testify as witnesses about reports, data compilations, records, or statements made in their official capacities.  4 Mueller & Kirkpatrick, *supra*, § 8:86, at 770-72.  The documents are considered trustworthy due to the "duty that comes with public service," and it is presumed that public officials execute their tasks "carefully and fairly, without bias or corruption, and this notion finds support in the scrutiny and risk of exposure that surround most government functions."  *Id.* at 770-71.  Absent the exception found at Rule 803(8), lawyers seeking to prove facts contained within official records would be forced to call public officials as witnesses to provide testimony

regarding the contents of the official records.  This would, of course, be burdensome and divert the efforts of officials called as witnesses from performing their public duties.  *Id.* at 771. With Rule 803(8), the information can be easily gleaned from the public records themselves, and has the added benefit of permitting proof of facts that might otherwise not be remembered by the author of the public record, or if no longer employed by the public agency, beyond the personal knowledge of any current official.  *Id.*

Moreover, ample authority, long predating the current preoccupation with ESI, supports the relationship between authentication under Rule 902(5) and admissibility under Rule 803(8).  *See, e.g.*, *Citizens Against Longwall Mining v. Colt LLC*, No. 05-3279, 2008 WL 927970, at *3 (C.D. Ill. Apr. 7, 2008) (Illinois State Geological Survey bulletin); *Tommaseo v. United States*, 75 Fed. Cl. 799, 806 (2007) (National Hurricane Center report); *Cherry Hill Vineyards, LLC v. Hudgins*, 488 F. Supp. 2d 601, 610 (W.D. Ky. 2006) (FTC report); *Mueller v. First Nat. Bank of the Quad Cities*, 797 F. Supp. 656, 657-58 (C.D. Ill. 1992) (two booklets published by the Comptroller of Currency and news release of bank president's remarks); *California Ass'n of Bioanalysts v. Rank*, 577 F. Supp. 1342, 1355 n.23 (C.D. Cal. 1983) (U.S. Department of Health and Human Services reports).

Finally, the *E.I. DuPont* court responded to any critics who might question the trustworthiness of public records found on the Internet, noting, "'Public records and government documents are generally considered not to be subject to reasonable dispute,' and '[t]his includes public records and government documents available from reliable sources on the Internet.'" 2004 WL 2347559, at *1 (quoting *In re Dingle*, 270 F. Supp. 2d 968, 971 (W.D. Mich. 2003)); *accord Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670 SBA, 2008 WL 4183981, at *7 (N.D. Cal. Sept. 9, 2008) (citing *Lorraine*, 241 F.R.D. at 551). "'[I]n an age where so much information is calculated, stored and displayed on a computer, massive amounts of evidence would be inadmissible'" if courts were to willingly accept a portrayal of all potential evidence located on the Internet as "inherently unreliable." *E.I. DuPont*, 2004 WL 2347559, at *1 (quoting *Chapman v. San Francisco Newspaper Agency*, No. C-01-02305 CRB, 2002 WL 31119944, at *2 (N.D. Cal. Sept. 20, 2002)). Of course, Rules 902(5) and 803(8) deal with threshold admissibility, not the weight afforded by the fact finder to the copies of online public records. The party against whom the evidence is admitted is free to attack its credibility or weight with all the concerns about reliability that often are directed against admissibility. *See* Fed. R. Evid. 104(e).

Exhibits # 1 and # 3 would justify certification in this case.   With the exception of the two settled claims on each exhibit, *see supra* nn.1-2, the printed webpages indicate there are claimants who have filed suits against "Charm City Cupcakes" for unpaid wages and contract claims.   Even taking into account that these suits are not overly descriptive, they do show there is at least a potential class of similarly situated plaintiffs in existence.   Therefore, certification is justified.

## VI. Conclusion

For the reasons stated during the hearing and expanded upon above, the Plaintiffs' Motion is granted.   The Defendant is ordered to produce to the Plaintiffs the employment and wage records, containing names and last known addresses, for all of Defendant's employees, workers, or laborers of any status, from January 2006 to the present.   After this production, the parties will confer and reach an agreement on the notice to be sent to the employees, and will provide the court with a copy of this notice.   The notice will be sent via first-class mail to the last known addresses of the employees, who will then have thirty days to opt-in to the suit.   A separate order shall issue this date.

November 7, 2008                        _____/S/_____
                                         Paul W. Grimm
                               United States Magistrate Judge